## C. B. JAMES V. THE STATE.

No. 17557.   Delivered May 8, 1935.
Rehearing Denied May 29, 1935.

The opinion states the case.

*J. E. Sturrock* and *M. E. Sandlin,* both of Woodville, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, death.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed Cleo James by cutting her with a knife.

Deceased was the common-law wife of appellant. After living with appellant for some time she had returned to her father's home. On the 3rd of November, 1934, appellant met deceased in the neighborhood of her father's home and stabbed her to death while she was holding her baby in her arms. Omitting the formal parts, we quote appellant's confession as follows:

"Well, I think she left her father's about 1932, come to Huntington to J. W. James's and asked for C. B. James, that is me, I was picking cotton about seven miles out in the country. They had a concert at school and when she came I was there. So I tried to get her to go on to her grandmother's and she wouldn't do it, and so we went back to my brother's in Huntington. We stayed there for about three weeks, and we told them all that we were not married lawfully. Me and her come down to her father's and got her clothes and everything and went back to my brother's, and went from there to my brother-in-law, G. N. Hubbards. From there we went to her grandfather's place and stayed there about one month, and moved from there to her uncle's and stayed there about a month and fifteen days, and went from there to my brother's, Barney James, then we went back to her granddaddy's, and from there we come back to her father's, C. S. McClure, stayed there about two months, I guess, and went back to her granddaddy's, stayed

there, I guess about one month, moved from there to Gus. Thibeaux's place at Lufkin. We lived there from the 1st of February, 1934, until the 15th of July, 1934, and then we moved down on the river and stayed there about a week, that is she was there about that long, I stayed there about four weeks. She left there and come back to her grandfather's, that is, I brought her back there and she stayed there about three weeks, and when she left there she quit me and come to her father's. She stayed there about two months up until I killed her. I went down to see her and the baby three times during that time.

"The agreement was when me and her started to living together, if she quit me, I was to kill her and myself too, and if I quit her, she was to kill me, and herself too. The first time I knew about her going with other men was when I was paying her board staying with one of my brother-in-laws, J. B. Russell, she called up Joe H. Smith up over the telephone, that had been a year and a half ago, and from that we have been having a little trouble along ever since. The next man I knew of brought her from her father's to Woodville, I was up at the Moore farm, Huntington, Texas. I got in to Charlie McClure's last Thursday morning about four o'clock. I have been working around there helping him ever since. I asked her yesterday morning did she still remember what the promise was, and she said she did, and I asked was she ready to go and she said she was not. I asked her the same thing again this morning and she said she wasn't ready. I asked her tonight if she was ready to go and she said she wasn't; I mean that I was asking her if she was ready to die; I told her to kiss her baby goodbye, and I talked to her a few minutes and she taken the baby back in her arms, and I told her I wanted to talk to her and she said she was not going to talk to me and that she was going to the house. I told her she wasn't, she was going to talk to me and she started on towards the house. I told her to come back and talk to me, and she proceeded to go on, and I went on and told her sister to take the baby. She wouldn't take the baby, and I taken the baby out of her arms, set the baby down on the ground, then I struck her two fatal blows with my knife. I told her I had kept my promise, and she told me I had killed her. I told her I knew I had, then I kissed her goodbye, and she kissed me goodbye, and I turned and walked off, asking her sisters to take the baby. And I walked on to the highway, turned around and started back to the house, after I walked a little ways, I met Mr. McClure and Mrs. McClure, I told them I was going to the house and kill myself. They said they didn't

want me to do that, that they wanted the law to punish me and I told them all right. I turned then and walked back to Hillister, and there I stayed until Mr. Ogden come and got me.

"We had separated along about the 10th day of June, 1934, before this time, and stayed separated about a week and then went back together. She begged me to go back to her, when I was carrying her to the bus, or let her go back to me rather. I told her for several hours I wasn't going back to her. Then I agreed to let her go back to me. We were never married. When I went down there last Thursday I had my mind made up to kill her. She knew I was going to kill her, she told her mother yesterday I was going to kill her."

Appellant did not testify in his own behalf. He introduced a physician who testified that he had examined appellant. He said: "With reference to his age and what I consider his mentality to be with reference to, say, a fifteen-year-old child, relatively speaking, I would say that it would be about the same as that of a child brought up in that kind of environment and that kind of educational advantages, etc." He testified, further, that, in his opinion, appellant was sane.

We are unable to agree with appellant's contention that the evidence is not sufficient to warrant the jury in inflicting the death penalty.

It is shown in bill of exception No. 1 that appellant objected to the admission of the confession in evidence on the ground that it was made by him in the office of the district attorney after he had been taken from the jail and carried there in the custody of the sheriff for the purpose of trying to obtain a confession. There is nothing in the bill of exception to show that the confession was not voluntarily made. If the statement of facts be considered, it appears to have been uncontroverted that after proper warning, as required by article 727, C. C. P., appellant voluntarily made said confession. The bill of exception fails to reflect error.

It is shown in bill of exception No. 2 that when the state was laying a predicate for introducing the confession appellant requested that the jury be retired. His request was denied. While it would have been proper for the court to have retired the jury while the predicate was being laid, we find nothing in the record indicating that appellant was in any manner prejudiced. Bingham v. State, 262 S. W., 747. The district attorney testified, in laying the predicate, that appellant was brought to his office by the sheriff; that he told appellant that he did not have to make any statement; that any statement he might

make would be used in evidence against him on the trial; that the statement must be voluntarily made, etc. He testified, further, that the confession was witnessed by certain men. There was nothing in the testimony laying the predicate that could have in any manner prejudiced appellant. Appellant made no effort to show the confession was coerced.

In his brief appellant contends that the confession was inadmissible because of the fact that deceased was not specifically named therein. The confession, when considered in connection with all of the facts and circumstances in evidence, plainly shows that appellant was admitting that he killed deceased. Appellant cites no case holding that the deceased must be identified in the confession by name, and we know of no authority laying down such a rule. In any event, appellant did not object to the reception of the confession on the ground he now urges.

As shown in bill of exception No. 3, a physician testified, in response to a question by appellant's counsel, that appellant had the mind of a fifteen-year-old child and, in effect, would not likely premediate before committing an offense. We quote from the bill to show the testimony elicited from the witness by the State and objected to by appellant: "Dr. J. C. Miller was placed on the stand as a witness in behalf of the defendant, and on recross-examination testified that if the defendant in his confession admitted that for three different days he had approached the party killed and inquired if she were prepared to die, and she said 'No,' and he postponed the killing another day and went back and asked the same question day after day until the evening of the killing, that would denote considerable premeditation on his part." In view of the testimony elicited by appellant, we think the State had the right to elicit the answer we have quoted.

The alleged misconduct of the jury is not supported by the record.

The judgment is affirmed.

*Affirmed.*

MORROW, P. J., absent.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—In his motion for rehearing appellant urges that his confession should not have been admitted in evi-

dence against him because he says the statements therein "did not conduce to establish his guilt." He seems to rely upon an expression in Musgrave v. State, 11 S. W., 927, containing the language quoted. In that case the court was discussing the provision of the Code of Criminal Procedure (present article 727, C. C. P.) which admits in evidence confessions not made under the formalities required by statute if statements contained in the confession are found to be true and conduce to establish the guilt of the party who makes it. We find no place for application of that phase of the statute in the present case in so far as the confession is concerned, which is set out in extenso in our original opinion. The sheriff testified that after appellant had been arrested he was searched for weapons and none was found on him, and upon being asked where the "knife" was he told the sheriff it was buried; he went with the sheriff and pointed out the place where the knife was buried. The handle of the knife had blood upon it. The statement of appellant made to the sheriff about the whereabouts of the knife fell under the provision of the statute to which reference has been made, but no objection seems to have been interposed to proof regarding the knife, and no valid objection occurs to us which could have been made.

Attached to appellant's motion for new trial was an affidavit of one juror which, among other things, contains the following statement: "It was also discussed by the jury that defendant did not offer any evidence or testimony in his defense." The statement is in no respect elaborated. No evidence heard upon the motion for new trial is brought forward, although the order overruling it recites that evidence thereon had been submitted. The effect of such recital is discussed in Crouchett v. State, 99 Texas Crim. Rep., 572, 271 S. W., 99, and many cases therein cited in the twelfth and thirteenth paragraphs of said opinion. Notwithstanding the state of the record appellant insists that we should hold that the jury discussed the failure of appellant to testify in his own behalf, basing such conclusion on the affidavit in question. The record shows that only one witness, a physician, was called by appellant. The witness was interrogated with reference to appellant's mentality, and upon the whole his testimony was more favorable to the State than to appellant. The record reveals that many persons were in a position to have testified in regard to such issue, and the discussion of the jury may well have had reference to a failure to call upon witnesses who did testify for their views in regard to appellant's state of mind. We are in no position to say that

appellant has shown any direct allusion to his failure to testify, or that what might have been said was an indirect but "necessary" reference to such fact. Boone v. State, 90 Texas Crim. Rep., 374, 235 S. W., 580; Kennington v. State, 49 S. W. (2d) 776.

The motion for rehearing is overruled.

*Overruled.*